UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LAYLA WILLIAMS, | ) |
| Plaintiff, | ) ) ) |
| | ) Case No. 3:11-cv-00251 |
| | ) Judge Trauger |
| v. | ) ) |
| STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM

Pending before the court is the defendant's Motion for Summary Judgment (Docket No. 13), to which the plaintiff has responded (Docket No. 19), and the defendant has filed a reply (Docket No. 21). For the reasons discussed herein, the defendant's motion will be granted.

## FACTUAL BACKGROUND

The plaintiff, Layla Williams, was formerly employed by the defendant, State of Tennessee, Department of Children's Services ("DCS").[1] In this lawsuit, she alleges that DCS discriminated against her on account of her sex and retaliated against her for refusing to remain silent about the alleged use of state resources by her former supervisor, Nicole Bingham, to further an extra-marital affair with a co-worker at the Mountain View Youth Development Center, a DCS facility located in Dandridge, Tennessee.

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of undisputed facts (Docket No. 15), the plaintiff's responses thereto (Docket No. 20), and related exhibits. The court draws all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir. 2009).

1

On September 26, 2005, the plaintiff commenced her employment with DCS as a Juvenile Justice Case Manager. (Docket No. 1, Ex. 1 at 2; Docket No. 4 at 2.) Her immediate supervisor at this time was Nicole Bingham. While Ms. Bingham was her supervisor, the plaintiff received positive job reviews. Specifically, from 2006 to 2008, Ms. Bingham gave the plaintiff overall ratings of "superior," "good," and "good" respectively. During this time period, the plaintiff and Ms. Bingham also became friends. (Docket No. 1, Ex. 1 at 3; Docket No. 4 at 2.)

However, according to the plaintiff, after she underwent brain surgery on July 16, 2008 to remove a tumor, her professional relationship with Ms. Bingham soured. (Docket No. 1, Ex. 1 at 3; Docket No. 19 at 2.) She alleges that their personal and professional relationship deteriorated even further as a result of a situation involving Darian J., a juvenile placed in DCS custody on January 27, 2009. (Docket No. 1, Ex. 1 at 4-6; Docket No. 19 at 2.) Darian J.'s custody case was assigned to the plaintiff, and she completed all necessary assessments related to his level of care and placement needs. (Docket No. 1, Ex. 1 at 4; Docket No. 4 at 2.) These assessments required Ms. Bingham's approval. (*Id.*)

The plaintiff alleges that Ms. Bingham failed to approve her assessments, deleted them from the DCS computer system, and instead created a new assessment for Darian J., increasing his level of care needs from low risk/foster home to high risk/maximum security. (Docket No. 1, Ex. 1 at 4.) Ms. Bingham allegedly told the plaintiff that she took these actions because the plaintiff did not appear competent since returning from her brain surgery and had otherwise failed to correctly complete the assessments. (*Id.* at 5.) According to the plaintiff, Ms. Bingham further stated that she preferred Darian J. to be placed at the Mountain View Youth Development Center in Dandridge, Tennessee, where her alleged paramour worked as a superintendent. (*Id.*)

2

Darian J. was ultimately placed at the DCS facility in Dandridge. (Docket No. 1, Ex. 1 at 5; Docket No. 4 at 3.) The plaintiff alleges that, through this placement, Ms. Bingham visited her paramour while attending meetings on matters concerning Darian J. (*Id.*) These alleged visits occurred on state time and required DCS to reimburse Ms. Bingham for the mileage to and from the Dandridge facility. (*Id.*)

On April 30, 2009, the plaintiff emailed Ms. Bingham, among others, to report that she obtained an order signed by a Circuit Court judge concerning Darian J.'s appeal hearing. Per the plaintiff's email, the order stated that Darian J.'s guilty plea had been set aside in its entirety. The plaintiff also wrote that, after discussing the matter with a DCS attorney, she was advised that Darian J. had to be released that day, since the order setting aside his guilty plea was dated April 8, 2009. Two minutes after receiving this correspondence, Ms. Bingham wrote to her alleged paramour and informed him that Darian J. had to be released that day.

The plaintiff alleges that, after she reported that Darian J. had to be immediately released, she began to feel repercussions at work from Ms. Bingham. Specifically, at her deposition, the plaintiff testified that "[i]t was getting very ugly at work, tensions were high, there was a lot of hostility, I was being followed, my leave was being denied,[2] I was given unrealistic job duties and time[-]frames to [complete] those job duties, and it was getting to the point that it was just

---

[2] It is undisputed that Ms. Bingham began requiring doctor's notes from the plaintiff for her sick leave requests. (Docket No. 1, Ex. 1 at 6; Docket No. 4 at 4.) DCS asserts that Ms. Bingham's team coordinator advised her that she needed to begin requesting such notes from the plaintiff because the plaintiff's leave balance was low and in jeopardy of falling into leave-without-pay status. (Docket No. 4 at 4.) On approximately May 20, 2009, DCS informed the plaintiff that she would be required to present a doctor's note when she called in sick until her annual/sick leave hours were brought up above 30 hours each. It appears that after crossing this threshold, the plaintiff would have earned enough annual/sick leave hours so that a doctor's note would no longer be necessary when she called in sick.

3

unrealistic for me to accomplish everything that was being put on me." (Docket No. 16, Ex. 1 at 8.)

In light of these conditions, the plaintiff requested a change in supervisors in May 2009. DCS granted this request. In addition, on approximately May 20, 2009, DCS held a conference with the plaintiff where, among other things, the following topics were discussed: (1) the need for the plaintiff to utilize the chain of command when issues arose with her supervisors; (2) the desire of DCS supervisory staff to assist and support the plaintiff; and (3) the availability of other channels of support independent of DCS.

Pursuant to the plaintiff's request for a new supervisor, DCS assigned Richard Miller to supervise the plaintiff. Mr. Miller remained the plaintiff's supervisor until she left DCS. The plaintiff described Mr. Miller as being a "very supportive supervisor." (Docket No. 16, Ex.1 at 8.) Indeed, during the time period in which Mr. Miller supervised the plaintiff, she received positive work reviews. Specifically, in 2009, Mr. Miller gave the plaintiff an overall rating of "good."

While Mr. Miller was her supervisor, DCS also approved the plaintiff's request for extended family and medical leave. In particular, the plaintiff was approved to take leave from July 30, 2010 through August 27, 2010.[3] Previously, DCS had also approved the plaintiff to take family and medical leave from July 23, 2008 through August 23, 2008.[4]

---

[3] The plaintiff testified at her deposition that she went on extended leave during this time period to participate in group therapy for work-related stress. (Docket No. 16, Ex. 1 at 8.)

[4] At her deposition, the plaintiff testified that she went on extended leave in 2008 because she required surgery to remove a brain tumor. (Docket No. 16, Ex. 1 at 8.)

Almost one year after DCS granted her request for a new supervisor, the plaintiff applied and interviewed for a Case Manager 3 position located in Anderson County, Tennessee. On April 7, 2010, DCS informed the plaintiff that, due to unforeseen circumstances, the department had cancelled the requisition for the position. While the plaintiff does not dispute this fact, she alleges that DCS reopened the position in late March or early April of 2011, almost one year after she was told that the requisition had been cancelled, and hired a former male co-worker, John Norris.

On August 31, 2010, the plaintiff signed a document entitled "Employee Resignation Notification," stating that her last workday at DCS would be September 15, 2010. In this document, the plaintiff wrote that she was resigning because she was "medically unable to continue in [her] current job position" at the time. Mr. Miller also signed this document and checked two boxes indicating that he recommended that the plaintiff be considered for rehire by DCS and other state agencies. Later, on September 13, 2010, the plaintiff emailed a DCS employee working on her sick leave claim and informed her that her last day of work would be September 15, 2010, as a medical issue precluded her from continuing to work. In that email, the plaintiff also stated that she did not have "the foresight to know that [she] would be such a mess [that she] could no longer work."

The plaintiff commenced this action on December 7, 2010 in the Chancery Court for Davidson County, alleging federal and state law claims against DCS. (*See* Docket No. 1; Docket No. 1, Ex. 1.) Specifically, she alleges claims for sex discrimination under Title VII of the Civil Rights Act of 1964, due to DCS' failure to promote her to the Case Manager 3 position and its maintenance of a hostile work environment. (Docket No. 1., Ex. 1 at 8-9.) She also asserts that

5

she was constructively discharged from her employment at DCS.  (*Id.* at 9.)  Moreover, the plaintiff claims that DCS retaliated against her for refusing to remain silent about Ms. Bingham's alleged use of state resources to further an extra-marital affair with a co-worker in violation of 42 U.S.C. § 1983, the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 (2011), and Tennessee common law.  (*Id.* at 7-8.)  DCS subsequently removed the action to this court on March 17, 2011 and filed its Answer on March 30, 2011.  (Docket Nos. 1, 4.)  It then filed the present motion on December 12, 2011.  (Docket No. 13.)

## ANALYSIS

### I.  Standard of Review

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial."  *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party."  *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  But "[t]he mere existence of a

6

scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II. The Defendant's Motion

DCS contends that it is entitled to summary judgment on all of the claims asserted in the plaintiff's Complaint. However, in her opposition brief, the plaintiff only made arguments concerning her Title VII sex discrimination claims. The plaintiff otherwise failed to address any of the arguments raised in DCS' motion concerning her remaining causes of action.

### A. Sex Discrimination in Violation of Title VII

#### 1) Failure to Promote

The plaintiff claims that DCS failed to promote her to the Case Manager 3 position on the basis of her sex. DCS contends that the plaintiff's failure to promote claim must be dismissed because she has offered no evidence establishing a prima facie case.

In order to establish a prima facie case, a plaintiff asserting a discrimination claim based on a failure to promote must show that: "(1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time [the] plaintiff's request for the promotion was denied." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005). For the purposes of this motion, DCS has assumed that the plaintiff is able to establish the first three elements of the

7

prima facie case. However, it contends that the plaintiff's failure to promote claim must fail because she cannot satisfy the fourth element.

Having reviewed the evidence in the record, the court finds that DCS' argument is well-taken. The record evidence shows that, on April 7, 2010, the plaintiff was informed that she was not selected for DCS' Case Manager 3 position because the department cancelled the requisition. It is also undisputed that nobody received the position at that time. Thus, because the record evidence shows that no individual, let alone one of similar qualifications outside the plaintiff's protected class, actually received the Case Manager 3 position at the time the plaintiff was denied the position, the plaintiff's failure to promote claim must be dismissed.

In her opposition brief, the plaintiff argues that DCS reopened the Case Manager 3 position in late March or early April of 2011, almost one year after she was denied the promotion and over six months after she resigned, and selected one of the plaintiff's former male co-workers, John Norris. She further contends that Mr. Norris had not applied for the position and was selected outside the ordinary protocol of filling promotions. In its reply brief, DCS asserts that, even if what the plaintiff alleges is true, she still cannot establish the fourth element of the prima facie case. The court agrees. Again, in order to establish the fourth element, the plaintiff must show that "an individual of similar qualifications who was not a member of the protected class received the job *at the time [the] plaintiff's request for the promotion was denied*." *White*, 429 F.3d at 240 (emphasis added). The plaintiff's attempt to satisfy the temporal requirement contained in this element with evidence of events that transpired one year after she was denied

8

Case 3:11-cv-00251   Document 22   Filed 03/26/12   Page 8 of 19 PageID #: 185

the promotion is simply unavailing. Accordingly, the court will grant summary judgment to DCS on the plaintiff's failure to promote claim.[5]

### 2) Hostile Work Environment

The plaintiff also claims that she was subjected to a hostile work environment at DCS on account of her sex. In order to establish a hostile work environment claim, the plaintiff must show that "(1) she is a member of a protected class (female), (2) she was subjected to harassment, either through words or actions, based on sex, (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating, hostile, or offensive work environment[,] and (4) there exists some basis for liability on the part of the employer." *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008). The harassment must satisfy an objective and subjective test, meaning that it "must be so severe or pervasive as to constitute a hostile or abusive working environment both to [a] reasonable person and the actual victim." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006).

In determining whether the harassment was sufficiently severe or pervasive, a court must consider the totality of the circumstances. *Randolph*, 453 F.3d at 733. The court may consider a number of factors in assessing whether a hostile work environment exists, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). A hostile

---

[5] DCS also argues that it has asserted a legitimate non-discriminatory reason for its decision not to promote the plaintiff and that the plaintiff cannot show that this reason was a pretext for discrimination. However, because the court has concluded that the plaintiff has failed to establish a prima facie case, it is unnecessary to analyze the remaining stages in the Title VII burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).

9

work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 21 (internal quotation marks and citations omitted).

The plaintiff's evidence of workplace harassment centers on the actions of her former female supervisor, Ms. Bingham. In particular, the plaintiff contends that, once she informed Ms. Bingham that Darian J. had to be immediately released from the Mountain View Youth Development Center, she began to feel repercussions at work in May 2009. Indeed, the plaintiff testified during her deposition that "[i]t was getting very ugly at work, tensions were high, there was a lot of hostility, I was being followed, my leave was being denied, I was given unrealistic job duties and time[-]frames to [complete] those job duties, and it was getting to the point that it was just unrealistic for me to accomplish everything that was being put on me." (Docket No. 16, Ex. 1.) Due to these conditions, the plaintiff requested a change in supervisors, which was granted by DCS. However, according to the plaintiff, DCS failed to provide her with a supervisor who was a juvenile justice team leader, as she requested, but instead assigned her a supervisor who was the team leader for foster care.[6] (Docket No. 16, Ex. 1 at 8.) In further support of her hostile work environment claim, the plaintiff points out that it is undisputed that a male co-worker filled the plaintiff's former position after her transfer. (Docket No. 1, Ex. 1 at 7; Docket No. 4 at 4.)

---

[6] In her Complaint, the plaintiff alleges that this assignment was a demotion to a more stressful and demanding position involving longer hours and increased time away from her children. (Docket No. 31, Ex. 1 at 6.) Yet, aside from this single allegation, the plaintiff has failed to adduce any evidence suggesting that this new assignment indeed constituted a demotion or reprisal by DCS.

10

In seeking summary judgment, DCS argues that the plaintiff has failed to prove two elements of her hostile work environment claim. First, it contends that the plaintiff cannot show that she was subjected to harassment based on her sex. In addition, it asserts that she has not demonstrated that the harassment was so severe or pervasive as to unreasonably interfere with her work performance.

The evidence provided by the plaintiff does not demonstrate that she was harassed on account of her sex. If anything, it suggests that Ms. Bingham retaliated against the plaintiff for reporting that Darian J. had to be immediately released. In an attempt to show that she was harassed on the basis of her sex, the plaintiff relies on an allegation in her Complaint noting that Ms. Bingham stated that she got along better with male subordinates. However, the plaintiff has presented no evidence supporting that allegation. Moreover, while it is true that the plaintiff's former position was filled by a male co-worker after DCS granted her request to change supervisors, no reasonable juror could conclude that this event, viewed by itself or in conjunction with the other evidence presented by the plaintiff, demonstrates that she suffered harassment on the basis of her sex.

However, even assuming that the plaintiff was subjected to harassment on account of her sex, her claim must nonetheless fail, because she cannot show that the harassment she experienced was so severe or pervasive as to constitute a hostile work environment. Again, the acts alleged to have created a hostile work environment all occurred in May 2009. However, in assessing whether the plaintiff has an actionable claim, the court must view the plaintiff's work environment with a broader lens and consider the totality of the circumstances. *Randolph*, 453 F.3d at 733. Viewing the plaintiff's work environment from this vantage point, the undisputed

11

evidence shows that she: (1) consistently received positive work reviews from her supervisors, including Ms. Bingham, throughout the course of her employment at DCS; (2) was granted requests for extended family and medical leave in both 2008 and 2010;[7] (3) was granted her request for a new supervisor in May 2009, although she did not receive the specific team placement she desired; (4) nonetheless described her new supervisor, Mr. Miller, as being very supportive; and (5) was recommended by Mr. Miller for rehire by DCS and other state agencies when she submitted her notice of resignation on August 31, 2010, more than one year after the alleged harassment took place. Given this backdrop, the alleged harassment suffered by the plaintiff was isolated, and no reasonable juror could find that it was so severe or pervasive as to create a hostile work environment. Indeed, the record evidence does not show that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Harris*, 510 U.S. at 21. Therefore, summary judgment will be granted to DCS and the plaintiff's hostile work environment claim will be dismissed.

### B. Constructive Discharge

In order to establish a constructive discharge claim, a plaintiff must show that "(1) the employer . . . deliberately create[d] intolerable working conditions, as perceived by a reasonable

---

[7] At her deposition, the plaintiff testified that she took extended medical leave during August 2010 due to work-related stress. (Docket No. 16, Ex. 1 at 8.) However, the plaintiff does not claim that such stress was attributable to any harassment she suffered on account of her sex during that time period. Nor is there any evidence in the record that supports such a claim. Indeed, the record evidence demonstrates that the plaintiff's supervisor at the time, Mr. Miller, was very supportive of her, gave her a positive work evaluation, and recommended her for rehire when she submitted her notice of resignation on August 31, 2010.

12

person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee . . . actually quit." *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012) (internal quotation marks and citations omitted). In determining whether there is a constructive discharge, "both the employer's intent and the employee's objective feelings must be examined." *Id.* (internal quotation marks and citations omitted). In assessing whether the plaintiff has met the first prong of the constructive discharge inquiry, courts:

> consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001) (internal quotation marks and citations omitted). DCS contends that summary judgment is appropriate because the evidence demonstrates that the plaintiff voluntarily resigned from her position. In opposing DCS' motion, the plaintiff failed to offer any argument as to why she was constructively discharged.

Having viewed the evidence in the record, the court finds that the plaintiff's working conditions were not objectively intolerable. As noted in the previous section, the alleged harassment experienced by the plaintiff occurred in May 2009 and was limited to one supervisor, Ms. Bingham. Upon her own request, DCS provided the plaintiff with a new supervisor, and there is no evidence demonstrating that she suffered any harassment following this change. The plaintiff has also failed to adduce any evidence triggering any of the other factors articulated in

13

*Logan* that are considered in determining whether the employer deliberately created intolerable working conditions.[8]

Moreover, the plaintiff has not presented any evidence that DCS intended to force her to quit. Although the plaintiff experienced problems with Ms. Bingham in May 2009, the undisputed record evidence shows that DCS supported the plaintiff both during that time period and throughout the remainder of her employment. Indeed, it granted her request for a new supervisor and subsequently authorized her request for extended medical leave. The plaintiff also acknowledged that her new supervisor, Mr. Miller, was "very supportive." It is undisputed that Mr. Miller gave the plaintiff a positive work review and recommended her for rehire by DCS and other state agencies when she resigned on August 31, 2010 due to certain medical issues that prevented her from continuing to work.

In sum, the evidence shows that the plaintiff voluntarily resigned from her position at DCS. Therefore, the plaintiff's constructive discharge claim will be dismissed.

### C. Section 1983

To bring a successful claim under 42 U.S.C. § 1983, a plaintiff must establish "that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right." *Berger v. City of Mayfield Heights*, 265 F.3d 399, 405 (6th Cir. 2001). Here, the plaintiff claims that DCS retaliated against her for exercising her First Amendment rights. (Docket No. 1, Ex. 1 at 8.) Specifically, she alleges that DCS retaliated against her for speaking out about its sanctioning of an alleged affair between Ms. Bingham and another co-worker at the Mountain View

---

[8] Again, although the plaintiff alleges that she was demoted after DCS granted her request for a new supervisor, she has failed to offer any evidence supporting this allegation.

14

Development Center. (*Id.*) DCS argues that it should be granted summary judgment because it is immune from suit under § 1983. The plaintiff did not respond to this part of the summary judgment motion.

The Eleventh Amendment forbids citizens from suing states in federal court, subject to two primary exceptions. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996). Those exceptions are: (1) where Congress has properly abrogated the states' immunity; and (2) where a state has explicitly consented to suit in federal court.[9] *Latham v. Office of Atty. Gen. of Ohio*, 395 F.3d 261, 270 (6th Cir. 2005) (*citing Seminole Tribe of Fla.*, 517 U.S. 44).

The plaintiff does not dispute that DCS is an agency of the State of Tennessee. Thus, DCS is protected by Eleventh Amendment immunity unless one of the aforementioned exceptions exists. However, neither exception applies here. As to the first exception, the Supreme Court has expressly held that the State is not a "person" subject to suit under § 1983, and that the statute does not otherwise abrogate Eleventh Amendment immunity. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66. (1989). Nor has the plaintiff demonstrated that the State of Tennessee has consented to being sued in federal court for alleged § 1983 violations. *See Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (citing Tenn. Code Ann. § 20-13-102(a) as barring suits in state court (or, implicitly, in federal court) against the state or where state treasury funds are potentially involved). Therefore, summary judgment is appropriate and the plaintiff's § 1983 claim will be dismissed.

---

[9] In addition, under the *Ex parte Young* doctrine, a plaintiff may sue an otherwise immune state official in his official capacity for prospective equitable relief to redress ongoing violations of federal law. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 474 (6th Cir. 2008). However, this exception is inapplicable here, because the plaintiff has not sued any state officials.

### D. Tennessee Public Protection Act

The plaintiff also alleges that DCS violated the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304 (2011), when it constructively discharged her for refusing to remain silent about Ms. Bingham's alleged use of state resources to further an affair. The TPPA provides that:

> (b) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> ....
>
> (d)(1) Any employee terminated in violation of subsection (b) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.

Tenn. Code Ann. § 50-1-304 (2011). A plaintiff must satisfy the following four elements in order to prevail on a statutory retaliatory discharge claim asserted under Tenn. Code Ann. § 50-1-304:

> (1) the plaintiff was an employee of the defendant;
>
> (2) the plaintiff refused to participate in or remain silent about illegal activity;
>
> (3) the defendant employer discharged or terminated the plaintiff's employment; and
>
> (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 437 (Tenn. 2011).

In support of its summary judgment motion, DCS argues that the plaintiff has failed to show that she was discharged and that, accordingly, her TPPA claim must be dismissed. The plaintiff did not respond to this contention. The court finds that DCS' argument is well-taken. It is undisputed that the plaintiff resigned from her position at DCS on August 31, 2010. Her signed Employee Resignation Notification form stated that she was resigning because her medical condition prevented her from continuing in her current job position and provided that her last day of work would be September 15, 2010. Later, on September 13, 2010, the plaintiff relayed this information in an email to a DCS employee. Moreover, there is no evidence in the record showing that the plaintiff's resignation was the result of a constructive discharge by DCS. Because the plaintiff has failed to adduce any evidence showing that she was discharged, her TPPA claim cannot stand.

### E. Common Law Retaliatory Discharge

DCS similarly argues that the plaintiff's common law retaliatory discharge claim must fail because there is no evidence in the record showing that the plaintiff was discharged or terminated from her employment. The plaintiff has not addressed this argument in her opposition brief. A common law retaliatory discharge claim contains the following four elements:

> (1) that an employment-at-will relationship existed;
> (2) that the employee was discharged;
> (3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

>    (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Webb*, 346 S.W.3d at 437-38.

Applying these elements here, the court finds that the plaintiff's common law retaliatory discharge claim must fail for the same reason her TPPA claim cannot proceed, that is, because she was not discharged. Again, it is undisputed that the plaintiff resigned and the record evidence demonstrates that this resignation was not the product of a constructive discharge, but was rather a voluntary act based on the plaintiff's medical condition at the time.[10] Accordingly, summary judgment will be granted to DCS as to this claim.

## **CONCLUSION**

---

[10] DSC also contends that, even if the plaintiff had been discharged, her common law retaliatory discharge claim would nonetheless be barred by the doctrine of sovereign immunity. The court agrees. Again, the defendant, DCS, is a state agency protected by Eleventh Amendment immunity. *See Seminole Tribe of Fla.*, 517 U.S. at 54. Moreover, neither of the primary exceptions to Eleventh Amendment immunity are applicable here. *See Latham*, 395 F.3d at 270. The first exception is inapplicable, because the plaintiff has not shown that Congress abrogated the state's immunity from suit on a common law retaliatory discharge claim. Nor has the plaintiff shown that the State of Tennessee has consented to being sued in federal court on such a claim. *See* Tenn. Code Ann. § 20-13-102(a) (2009).

Based on the foregoing, the defendant's Motion for Summary Judgment (Docket No. 13) will be **GRANTED**.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge